UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

HENRY EAGLIN                             CIVIL ACTION NO. 6:16-cv-01045

VERSUS                                   JUDGE DOHERTY

U.S. COMMISSIONER, SOCIAL                MAGISTRATE JUDGE HANNA
SECURITY ADMINISTRATION

## REPORT  AND  RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be affirmed.

### ADMINISTRATIVE  PROCEEDINGS

The claimant, Henry Eaglin, fully exhausted his administrative remedies before

filing this action in federal court.  He filed an application for disability insurance

benefits ("DIB"), alleging disability beginning on June 9, 2012.[1]  His application was

denied.[2]  He then requested a hearing,[3] which was held on December 10, 2014 before

Administrative Law Judge Kim A. Fields.[4]  The ALJ issued a decision on January 15,

---

[1]     Rec. Doc. 10-1 at 50, 108.

[2]     Rec. Doc. 10-1 at 49.

[3]     Rec. Doc. 10-1 at 63.

[4]     Rec. Doc. 10-1 at 27-41.

2015,[5] concluding that the claimant was not disabled within the meaning of the Social Security Act from the alleged disability onset date through the date of the decision. The claimant asked the Appeals Council to review the decision, but review was denied.[6]    Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g). The claimant then filed this action seeking review of the Commissioner's decision.

### SUMMARY OF PERTINENT FACTS

The claimant was born on January 7, 1957.[7]  At the time of the ALJ's decision, he was 58 years old.  He completed the tenth grade,[8] and has relevant work experience in the shipping department of a bakery.[9]  He alleged that he has been disabled since June 29, 2012[10] due to chronic fatigue syndrome.[11]

_____

[5]    Rec. Doc. 10-1 at 14-20.

[6]    Rec. Doc. 10-1 at 340.

[7]    Rec. Doc. 10-1 at 108.

[8]    Rec. Doc. 10-1 at 32.

[9]    Rec. Doc. 10-1 at 32.

[10]    Rec. Doc. 10-1 at 32, 50.

[11]    Rec. Doc. 10-1 at 39, 50.

-2-

On June 8, 2011, the claimant was seen by Dr. Juan C. Zeik of Acadiana Renal Physicians.[12]  He complained of a lack of energy, weight loss, aches and pains, being tired, a weird feeling in his head, and being off balance.  A positive Romberg test confirmed that his balance was impaired.  His proprioception was OK.  Dr. Zeik's assessments were hypertension, BPH (prostate enlargement), and neuropathy.  An MRI of the brain was scheduled, and Vitamin D was prescribed.

The claimant returned to Dr. Zeik on November 9, 2011[13] with similar complaints.  His Vitamin D dosage was adjusted and he was assessed as being stable.

On March 21, 2012, the claimant again saw Dr. Zeik.[14]  He reported that he was out of work and could not function due to weakness.  He had multiple bodily complaints including weakness and tingling of his arms but no renal issues.

On June 22, 2012, an ultrasound of the claimant's abdomen showed small cysts in the kidneys.[15]

On July 2, 2012,[16] the claimant was seen in the emergency department at University Medical Center ("UMC"), complaining of nausea, weight loss over a

---

[12]    Rec. Doc. 10-1 at 223.

[13]    Rec. Doc. 10-1 at 222.

[14]    Rec. Doc. 10-1 at 221.

[15]    Rec. Doc. 10-1 at 217.

[16]    Rec. Doc. 10-1 at 285-290.

period of years, loss of appetite, burning and throbbing in his feet for the past year, generalized weakness for a few months, left wrist pain, and pain under his left shoulder blade. He reported that he had been seen at Lafayette General Medical Center for the same complaints but "they can't find anything." He denied being in pain. He was discharged with diagnoses of fatigue, weight loss, and nausea.

The claimant saw internist Dr. Juan Perez Ruiz on July 6, 2012.[17] His chief complaints were nausea, weight loss, weakness, and constipation. He gave a history of hypertension, Vitamin D deficiency, nausea, colon polyps, and low testosterone. He reported a thirty pound weight loss over two years, weakness, and decreased strength. He requested a disability finding. Dr. Ruiz noted that the claimant appeared well, and he ordered updated laboratory tests and prescribed Zoloft (which treats depression and anxiety).

On August 14, 2012, the claimant saw Dr. Bradley J. Chastant, II, another internist.[18] He complained of fatigue and malaise. Dr. Chastant ordered laboratory tests and referred the claimant to a neurologist.[19]

---

[17]    Rec. Doc. 10-1 at 258-262.

[18]    Rec. Doc. 10-1 at 263.

[19]    Rec. Doc. 10-1 at 270-274.

The claimant returned to Dr. Zeik on September 26, 2012,[20] complaining about low energy and shortness of breath. He reported that he could not "pick up weight like he used to." Dr. Zeik noted that the claimant's hypertension was controlled, he was taking Paxil, urinalysis results from the testing ordered by Dr. Chastant would be forthcoming, and that the claimant should return in six months.

The claimant saw Dr. Justin W. Fontenot of Lafayette Arthritis and Endocrine Clinic on September 13, 2012 with a primary complaint of fatigue and secondary complaints of postural dizziness, nausea, weight loss, decreased appetite, decreased libido, and generalized weakness.[21] He reported having seen a cardiologist and a gastroenterologist. He stated that he takes Benadryl, Melatonin, and Ambien for insomnia. His mood was depressed. Zoloft had caused nausea, and he was currently taking Paxil. Dr. Fontenot's assessment was fatigue, subjective weakness, depression, chronic kidney disease ("CKD"), history of Vitamin D deficiency, and orthostatic hypertension.

On September 27, 2012, Dr. Fontenot wrote to Dr. Chastant,[22] explaining the results of recent testing. Most of the test results were in the normal range, but the

---

[20]     Rec. Doc. 10-1 at 220.

[21]     Rec. Doc. 10-1 at 206-207.

[22]     Rec. Doc. 10-1 at 203-204.

claimant did have moderate or stage 3 chronic kidney disease ("CKD.")  It was Dr. Fontenot's opinion that there was no endocrine cause of his symptoms.

The claimant returned to Dr. Fontenot's office on October 3, 2012, following up with regard to his fatigue.[23]  He still felt "terrible" with general weakness.  Dr. Fontenot diagnosed him with hypogonadism, fatigue, dizziness (with an occult cause), insomnia, and muscle weakness (also with an occult cause).  Dr. Fontenot was considering obtaining a neurologist's opinion or a rheumatologist's opinion, and he prescribed Androgel (for the hypogonadism).

On October 23, 2012,[24] the claimant told Dr. Fontenot that he was still tired all the time, awakened several times at night, and experienced dizziness upon standing. The doctor's diagnoses were unstable hypogonadism, chronic fatigue with an occult cause, peripheral neuropathy, and possible postural orthostatic tachycardia syndrome. He prescribed Lisinopril (which treats hypertension).

The claimant returned to Dr. Chastant on October 24, 2012 for treatment of a superficial abscess and continued complaints of fatigue.[25]

---

[23]        Rec. Doc. 10-1 at 202, 205.

[24]        Rec. Doc. 10-1 at 200-201.

[25]        Rec. Doc. 10-1 at 264.

On November 12, 2012, the claimant again saw Dr. Fontenot.[26]  Dr. Fontenot noted that he was doing about the same and was still generally weak.   His medications were adjusted.

The claimant again visited Dr. Fontenot on November 30, 2012.[27]   He complained of pain in his right ankle, swelling and pain with walking that improved when he was off his feet, as well as chronic burning in his feet.  The doctor's plan was to determine whether the claimant had arthritis or an autoimmune disease such as lupus.  New medications were prescribed.

On December 6, 2012, Dr. Fontenot wrote to Dr. Chastant,[28] stating that the claimant "has been suffering from terrible chronic fatigue which has caused him to be out of work."  He also noted that the claimant has peripheral neuropathy; vague, diffuse muscle weakness; and postural dizziness.  Dr. Fontenot explained that he diagnosed low testosterone and prescribed a medication for that condition but the claimant was still not feeling much better in terms of muscle strength.  Dr. Fontenot also explained that he prescribed Midodrine for postural dizziness and orthostatic hypotension and Lisinopril for hypertension.  At his last office visit, Dr. Fontenot had

---

[26]     Rec. Doc. 10-1 at 198-199.

[27]     Rec. Doc. 10-1 at 196-197.

[28]     Rec. Doc. 10-1 at 193-195.

found some edema near the claimant's right ankle but a full range of motion, mild pain, and minimal synovitis.  He had no synovitis in other joints, and his shoulders and hips had a full range of motion.  His muscle weakness was grossly 4+/5 throughout his body.  Dr. Fontenot had ordered laboratory testing that was mostly normal, with a weakly positive result on the lupus panel and a positive result for the Sjogren's SSA antibody.  However, Dr. Fontenot did not find these lab results to be conclusive because the claimant did not display any other symptoms of lupus or Sjogrens's syndrome.  Dr. Fontenot stated that he does not know what underlies the ankle problem, which remained swollen despite treatment with Prednisone.  It was Dr. Fontenot's opinion that, due to the chronic fatigue, mild weakness, and peripheral neuropathy, the claimant should consult with a neurologist.  Finally, Dr. Fontenot explained that he had prescribed Intermezzo to help the claimant sleep.

The claimant's next appointment with Dr. Chastant was on December 13, 2012.[29]  He complained of weakness, fatigue, and leg pain and swelling that had gone on for about four weeks.  He also complained that he was hurting all over, particularly in the lower back.  Dr. Chastant recommended referral to a neurologist.

---

[29]    Rec. Doc. 10-1 at 265.

On December 20, 2012, the claimant saw Dr. Adam N. Foreman of the Southwest Neuroscience Center.[30]  His chief complaints were headache and fatigue. He reported that he had been out of work since June because he could no longer do the work because of muscle weakness and fatigue.  Dr. Foreman's examination detected no weakness.  He prescribed Zocor (a statin drug).

On December 31, 2012, the claimant was evaluated at Sleep Labs of Acadiana.[31]  He snored and had some restless leg movement but did not have obstructive sleep apnea.

The claimant returned to Dr. Foreman on January 9, 2013,[32] and Dr. Foreman diagnosed likely chronic fatigue syndrome.

The claimant returned to Dr. Chastant on February 21, 2013[33] with the same symptoms, and Dr. Chastant described his condition as chronic fatigue syndrome.

In March 2013, the claimant again saw Dr. Foreman.[34]  He had started taking Requip for restless leg syndrome, and was complaining of right foot pain and swelling, right shoulder blade pain, and new low back pain as well as chronic head

---

[30]    Rec. Doc. 10-1 at 214-215.

[31]    Rec. Doc. 10-1 at 216.

[32]    Rec. Doc. 10-1 at 212-213.

[33]    Rec. Doc. 10-1 at 266.

[34]    Rec. Doc. 10-1 at 210-211.

fogginess.  Dr. Foreman stated that he did not believe the claimant had a primary neurological disease.  He discontinued the Requip, prescribed Super B vitamins, and noted that the claimant declined acupuncture.

The claimant returned to Dr. Zeik on March 27, 2013,[35] reporting that he had seen Dr. Foreman and been diagnosed with chronic fatigue syndrome and restless leg syndrome.  He complained of a lump in his right testicle.  He was still taking Paxil and stated that the medication prescribed for his restless legs was not working.  He was referred to Dr. Lugo to rule out myasthenia gravis, a chronic autoimmune neuromuscular disease.

The claimant saw Dr. Fabian Lugo on April 1, 2013.[36]  Dr. Lugo's assessment was chronic subjective generalized weakness of the limbs of uncertain etiology.  He ordered diagnostic testing.

The claimant then saw Dr. James N. Domingue, a neurologist, on April 4, 2013.[37]  Dr. Domingue found the claimant's symptoms compatible with neuropathy and opined that he might have a combined myopathy/neuropathy.  His respiratory problem suggested Pompe's disease.  Based on the claimant's reflexes, anterior horn

---

[35]    Rec. Doc. 10-1 at 219

[36]    Rec. Doc. 10-1 at 225-231.

[37]    Rec. Doc. 10-1 at 238-251.

cell disease was the differential diagnosis.  More testing was ordered.  EMG and nerve conduction study abnormalities implied lesions of the right median nerve at the wrist and of the right ulnar nerve at the elbow but there was no evidence of myopathy. Nerve conduction studies were done on both legs, EMG was done on the right leg, and repetitive stimulation was done on the right arm.  The study was normal without evidence of polyneuropathy, myopathy, or neuromuscular junction defect.

On April 25, 2013, the claimant sought treatment in UMC's emergency department,[38] complaining of a testicular lump without pain, swelling, or redness. The clinical impression was testicular nodule on the right side.

On May 15, 2013, the claimant was seen at UMC's internal medicine clinic with regard to the testicular mass.[39]  He complained of severe headache, weakness, and nausea.  He was diagnosed with an epididymal head cyst and was referred to the urology clinic.

On May 21, 2013,[40] the claimant returned to UMC's emergency department, complaining of low back pain, head pain, and "just pain all over."  Also, he had tirea capitus (ringworm) on his right temple.

---

[38]    Rec. Doc. 10-1 at 291-295.

[39]    Rec. Doc. 10-1 at 296-299.

[40]    Rec. Doc. 10-1 at 300-306.

-11-

The claimant saw a doctor in UMC's internal medicine clinic on June 10, 2013,[41] complaining of upper respiratory problems and back pain. The diagnoses were epigastric pain possibly due to Ibuprofen prescribed by the emergency room physician and epididymal head cyst. It was noted that his blood pressure was at goal.

On July 14, 2013, the claimant was again seen at UMC's emergency department.[42] He had an abrasion on his lower left leg that he stated was the result of his leg going through the ceiling while he was up in the attic. He gave a history of peripheral neuropathy and chronic muscle fatigue syndrome. The wound was cleaned and dressed.

The claimant visited Dr. Chastant on August 21, 2013[43] concerning a laceration of his left leg, chronic fatigue syndrome, hyperlipidemia, hypertension, testicular lump, and low testosterone. Dr. Chastant's examination of his musculoskeletal system showed a normal range of motion, normal strength, no swelling, and a normal gait. Dr. Chastant ordered Bactrim for the laceration and ordered updated lab work. He was to return in six months.

---

[41]    Rec. Doc. 10-1 at 307-310.

[42]    Rec. Doc. 10-1 at 311-317.

[43]    Rec. Doc. 10-1 at 267-269.

On December 16, 2013, the claimant was seen in the urology clinic at UMC regarding the testicular mass.[44]

On April 19, 2014, the claimant was examined by Dr. Jacques Courseault at the request of Disability Determination Services.[45]  The claimant told Dr. Courseault that he was diagnosed with chronic fatigue syndrome six years earlier, stated that he had difficulty lifting, and said he can only lift twenty to twenty-five pounds before getting dizzy and fatigued.  At that time, the claimant was taking Nexium (a heartburn medication), HCTZ (a diuretic), Atacand (a high blood pressure medication), and Zolpidem (which treats sleep problems).  He also gave a history of neuropathy and alcohol abuse.  He denied low back pain, knee pain, shoulder pain, and neck pain. There was no redness or obvious deformity of any joint.  He denied shortness of breath at rest and on exertion.  He denied a change in appetite.  He denied weakness, sensory loss or dysfunction, and trouble sleeping at night.  Examination revealed no muscle asymmetry, atrophy, or involuntary movements.  He was able to rise from a sitting position without assistance, stand on tiptoes, walk on his heels, and tandem walk.  He was able to bend and squat without difficulty.  His grip strength was 5/5 with adequate fine motor movements, dexterity, and ability to grasp objects

---

[44]     Rec. Doc. 10-1 at 318.

[45]     Rec. Doc. 10-1 at 324-328.

bilaterally.  There was no edema, cyanosis, or erythema in this extremities.  He did not appear to be depressed or anxious.  He could communicate without deficits, his memory was intact, and he displayed good insight and cognitive function.  He had no abnormal reflexes.  Romberg test was negative.  He had good muscle tone, 5/5 strength bilaterally in all muscle groups, and a normal range of motion in all joints. Dr. Courseault opined that the claimant should be able to sit, walk, and/or stand for a full workday, lift and carry objects without limitation, hold a conversation, respond appropriately to questions, and carry out and remember instructions.

On September 2, 2014, the claimant was seen at the UHC Eye Clinic in Lafayette, Louisiana.[46]  He had intermittent pain in the left side of his head and blurred vision.  Retinal tears were diagnosed.

On December 10, 2014, the claimant testified at a hearing regarding his symptoms, medical treatment, and functionality.  At that time, he was taking Vitamin D, Hydrochlorothiazide and Atacund for hypertension, Paxil for depression, Nexium for gastroesophageal reflux disease, and Melatonin and Benadryl for sleep problems.[47]  He testified that he had worked for twenty years in a bakery's shipping department.  He stated that he could walk for about fifteen to twenty minutes without

---

[46]        Rec. Doc. 10-1 at 333.

[47]        Rec. Doc. 10-1 at 186.

getting tired, could stand for about that same length of time, and could sit in a comfortable chair for an unlimited amount of time.  The claimant had difficulty estimating how much weight he could lift, although he stated that he could not hold a gallon of milk in one hand for more than five minutes due to diminished strength. He does no housework, cooking, laundry, or gardening but occasionally does yard work "when he can."  He stated that mowing the grass makes him tired, results in breathing heavily, and requires frequent rest periods.  Similarly, he testified that taking a shower results in heavy breathing and requires that he rest afterwards.  He watches television six to seven hours per day.  He said that he has difficulty falling asleep and difficulty staying asleep but does not nap during the day.  He testified that he feels tired, weak, and fatigued.  He also testified that he feels pain every day.  He explained that he had been to numerous doctors and was diagnosed by Dr. Adam Foreman with chronic muscle fatigue syndrome, for which there is no treatment.  He stated that he had a mental health treatment appointment scheduled.

A consulting physician also testified at the hearing.  His opinion was that the claimant's medical condition does not limit him mentally.[48]

The claimant seeks reversal of the Commissioner's adverse decision.

---

[48]        Rec. Doc. 10-1 at 29-31.

# ANALYSIS

## A.    STANDARD OF REVIEW

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[49] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[50] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[51]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[52] In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[53] Conflicts in the

---

[49]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[50]    *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[51]    *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[52]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[53]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

evidence[54] and credibility assessments[55] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education, and work experience.[56]

**B.**   **ENTITLEMENT TO BENEFITS**

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[57]  A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[58]  A claimant is disabled only if his physical or mental impairment

---

[54]     *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[55]     *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[56]     *Wren v. Sullivan*, 925 F.2d at 126.

[57]     See 42 U.S.C. § 423(a).

[58]     42 U.S.C. § 1382c(a)(3)(A).

or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[59]

## C.   EVALUATION PROCESS AND BURDEN OF PROOF

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.  This process requires the ALJ to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[60] "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[61]

---

[59]     42 U.S.C. § 1382c(a)(3)(B).

[60]     20 C.F.R. § 404.1520.

[61]     *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[62] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[63]   The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[64]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[65]   This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[66]   If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[67]

---

[62]    20 C.F.R. § 404.1520(a)(4).

[63]    20 C.F.R. § 404.1545(a)(1).

[64]    20 C.F.R. § 404.1520(e).

[65]    *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[66]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[67]    *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

### D.    THE ALJ'S FINDINGS AND CONCLUSIONS

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since June 29, 2012, the alleged disability onset date.[68] This finding is supported by substantial evidence in the record.

At step two, the ALJ found that the claimant has chronic fatigue syndrome but determined that this condition is not severe.[69]  The claimant challenges this finding.

Having concluded that the claimant does not have a severe impairment, the ALJ did not evaluate the claimant's residual functional capacity or proceed to steps three, four, and five of the analysis.  Instead, the ALJ found that the claimant was not disabled from June 29, 2012 (the alleged disability onset date) through January 15, 2015 (the date of the decision).  The claimant challenges this finding.

### E.    THE ALLEGATIONS OF ERROR

The claimant contends that the ALJ erred in finding that his chronic fatigue syndrome is not a severe impairment.

---

[68]       Rec. Doc. 10-1 at 16.

[69]       Rec. Doc. 10-1 at 16.

## F.    THE ALJ DID NOT ERR IN EVALUATING THE SEVERITY OF THE CLAIMANT'S IMPAIRMENTS

The ALJ found, at step two of the requisite sequential analysis, that the claimant has chronic fatigue syndrome, but this condition is not severe.  To aid in evaluating whether a claimant's medical condition qualifies as a severe impairment, the Commissioner issued regulations defining a "severe impairment" as one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."[70]  The Fifth Circuit held that a literal application of that definition is inconsistent with the statutory language and legislative history of the Social Security Act.[71]  Therefore, the Fifth Circuit established the following standard for determining whether a claimant's impairment is severe:  an impairment is not severe only when it is a "slight abnormality" having "such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education[,] or work experience."[72]  The ALJ recited this standard in the ruling[73] and

---

[70]    20 C.F.R. §§ 404.1520(c), 416.920(c), 404.1521 ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.").

[71]    *Stone v. Heckler*, 752 F.2d 1099, 1104–05 (5th Cir. 1985).

[72]    *Stone v. Heckler*, 752 F.2d at 1101.

[73]    Rec. Doc. 10-1 at 16.

then analyzed whether the claimant's functionality is impaired by the symptoms of his chronic fatigue syndrome that are documented in the record.

The claimant argued that the ALJ erred by failing to analyze his chronic fatigue syndrome in accordance with the criteria set forth in SSR 14-1p, which specifically addresses that condition.  But that regulation requires that chronic fatigue syndrome be evaluated in accordance with the five-step sequential analysis used for evaluating all impairments.  SSR 14-1p directs that, at step two, an ALJ must consider the symptoms related to chronic fatigue syndrome in determining whether a claimant's impairments are severe.  More particularly, "[i]f we find fatigue, pain, neurocognitive symptoms, or other symptoms cause a limitation or restriction, and they have more than a minimal effect on a person's ability to perform basic work activities, we must find that the person has a 'severe' impairment."[74]  In this case, the ALJ reviewed the record and determined that there was insufficient evidence of functional limitations to support a conclusion that the claimant's chronic fatigue syndrome is severe under the standard enunciated by the Fifth Circuit.

Even if the ALJ had failed to evaluate the claimant's chronic fatigue syndrome in accordance with SSR 14-1p, however, that would be a material consideration but would not automatically require the Commissioner's decision to be remanded.

---

[74]    SSR 14-1p, 2014 WL 1371245, at *8 (April 3, 2014).

Social Security rulings are not binding on the federal courts,[75] but they are "binding on all components of the Social Security Administration."[76]  Furthermore, where the rights of individuals are affected, an agency must follow its own procedures, even where the procedures are more rigorous than otherwise would be required.[77]  If an agency violates its own rules, with resulting prejudice, then the underlying proceedings are tainted, and any resulting actions cannot stand.[78]  Therefore, an ALJ's failure to adhere to the procedures proscribed by the Social Security regulations may constitute a valid basis for reversal and remand of an administrative decision.  But such a failure does not necessarily dictate a remand for further review.  Instead, a harmless error analysis applies when an ALJ fails to comply with a regulation or Social Security Ruling.[79]  Therefore, a court will affirm a decision if the ALJ's error was harmless and remand the decision if the plaintiff was prejudiced due to the error.  A plaintiff establishes prejudice by showing that the ALJ

---

[75]    *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001).

[76]    20 C.F.R. § 402.35(b)(1).

[77]    *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981).

[78]    *Hall v. Schweiker*, 660 F.2d at 119.

[79]    See *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003); *Shave v. Apfel*, 238 F.3d 592, 597 (5th Cir. 2001).

could have reached a different outcome but for the error in question.[80]  In this case, if the ALJ had failed to comply with SSR 14-1p, the ALJ's error would have been harmless because there is no basis for reaching a decision contrary to that of the ALJ. In other words, there is no evidence in the record establishing that the claimant has severe functional limitations resulting from his chronic fatigue syndrome.

The claimant established that he has been diagnosed with chronic fatigue syndrome.  But the existence of an impairment does not in itself establish disability; a claimant is disabled only if he is incapable of engaging in any substantial gainful activity.[81]

The ALJ reviewed the claimant's symptoms and his medical treatment.  The evidence in the record supports the ALJ's conclusion that the claimant has not proven that his chronic fatigue syndrome is severe or disabling.  Although Dr. Fontenot described the claimant's chronic fatigue syndrome as "terrible," he did so without detailing any specific activities that the claimant told him he can no longer participate in and also without listing any work activities that the doctor, in his opinion, believes the claimant can no longer perform.  Thus, Dr. Fontenot's records do not establish

---

[80]     *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000).

[81]     *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992); *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986).

any functional limitations resulting from the claimant's chronic fatigue syndrome. Indeed, there is no evidence in the record from any treating physician setting forth limitations on the claimant's activities due to his chronic fatigue syndrome or any other disease that he might have.

The claimant argued that Dr. Fontenot's statement that the claimant "has been suffering from terrible chronic fatigue which has caused him to be out of work"[82] is an expression of Dr. Fontenot's opinion that the claimant is unable to work.  This Court disagrees, and interprets that statement as Dr. Fontenot's observation that the claimant told him he had stopped working due to his condition and not as Dr. Fontenot's opinion that the claimant is not capable of working.  Furthermore, even if Dr. Fontenot had opined that the claimant was unable to work, that opinion would not have ended the analysis.  Whether a claimant is disabled and unable to work is a determination reserved to the Commissioner.[83]

Dr. Fontenot also noted, in December 2012, that the claimant had slightly reduced muscle strength, rating it as 4+/5 throughout his body.[84]  But the claimant's

---

[82]    Rec. Doc. 10-1 at 193.

[83]    20 C.F.R. § 404.1527(e).  See, also, *Martinez v. Chater*, 64 F.3d at 176 (quoting *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990) ("the ALJ has sole responsibility for determining a claimant's disability status.")).

[84]    Rec. Doc. 10-1 at 193-195.

subjective complaints of weakness have not been objectively corroborated. Furthermore, the claimant's subjective complaints have not been consistent.  In particular, Dr. Foreman detected no weakness when he examined the claimant on December 20, 2012.[85]  When Dr. Chastant examined the claimant on August 21, 2013, he had a normal range of motion, normal strength, no swelling, and a normal gait.[86]  On April 19, 2014, when the claimant was examined by Dr. Jacques Courseault,[87] he denied low back pain, knee pain, shoulder pain, and neck pain; he denied shortness of breath at rest and on exertion; and he denied weakness, sensory loss or dysfunction, and trouble sleeping at night.  He told Dr. Coursealt that he could lift twenty to twenty-five pounds without difficulty and could sit without limitation. Dr. Courseault's physical examination of the claimant revealed no muscle atrophy, grip strength of 5/5, adequate fine motor movements and dexterity, no abnormal reflexes, good muscle tone, 5/5 strength bilaterally in all muscle groups, and a normal range of motion in all joints.  When this specific information from the treatment notes is viewed together with the rest of the record, the evidence collectively constitutes substantial evidence supporting the ALJ's conclusion that the claimant's chronic

---

[85]     Rec. Doc. 10-1 at 214-215.

[86]     Rec. Doc. 10-1 at 267-269.

[87]     Rec. Doc. 10-1 at 324-328

fatigue syndrome is not severe and consequently is not disabling. Dr. Courseault's functional analysis is the only one in the record, and in it Dr. Courseault opines that the client has no functional limitations. Aside from the claimant's vague and nonspecific subjective complaints, which fail to identify the work-related functions that the claimant allegedly can no longer perform, there is no contrary evidence in the record.

This Court therefore finds that the ALJ's decision was reached by employing the proper legal standards and further finds that substantial evidence in the record supports the ALJ's findings.

## CONCLUSION AND RECOMMENDATION

**IT IS THE RECOMMENDATION** of this Court that the decision of the Commissioner be **AFFIRMED** and this matter be dismissed with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[88]

Signed in Lafayette, Louisiana, this 30th day of May 2017.

_____

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[88]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).